UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 1:21-cr-00325-CKK |
| v. : | |
| : | |
| BOYD CAMPER, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Boyd Camper to two months incarceration and $500 in restitution.

**I.      Introduction**

The defendant, Boyd Camper, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Boyd Camper pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. As explained herein, a prison sentence of two months is appropriate in this case because (1) Camper entered the U.S. Capitol despite seeing violence between rioters and officers -- Camper made his son stay back because he saw the danger; (2) Camper concealed video and audio evidence collected by his Go-Pro camera he brought inside the Capitol; and (3) Camper made statements to the media indicating a complete lack of remorse and suggesting the possibility of future violence ("We're going to take this damn place.").

1

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification and the potential for future violence renders a significant sentence both necessary and appropriate in this case.

## II.  Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense). As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Boyd Camper's Role in the January 6, 2021 Attack on the Capitol*

Boyd Camper flew from Bozeman, Montana to Washington D.C. along with a group of individuals from Montana to attend the rally organized by former President Trump.  Camper also brought his ten-year old son on the trip.  On the evening of January 5th, Camper stayed in a residence rented by another friend who traveled with him from Montana to attend the rally.

On January 6, 2021, Camper and his son left for the rally around 4:30 a.m.  Camper wore a blue coat, a camouflage hat with the label "Trump 2020," and carried a Go-Pro camera attached to a pole.  While at the rally, Camper learned about the march to the Capitol building and decided to participate.  Upon arriving at the Capitol with his son, Camper observed the crowd making its

way up the Capitol stairs. At this point, Camper asked one of his friends from Montana to stay with his son because it wasn't safe.

Camper moved ahead, observing a number of confrontations between police and rioters including police being pushed by rioters and police using tear gas. Camper reports encountering an individual with a pitchfork and claims he took it away from the man and threw it to the ground because he did not want any violence. Camper made it to the top of the Capitol steps where he got tear gas in his eyes. Camper was captured entering the Capitol building through the Upper West Terrace door at approximately 2:45 p.m. He can be seen using his Go-Pro camera.



Surveillance later captured Camper walking through the Rotunda and adjacent hallways.





Throughout the day on January 6, 2021, defendant Camper was in possession of a Go-Pro camera with an extension pole that he held above shoulder level while recording inside and outside the Capitol. Defendant Camper recorded his entry into the Capitol, and he continued to record with the Go-Pro camera throughout his time inside the Capitol building. The Go-Pro camera had audio capabilities that recorded defendant Camper's statements while he was both inside and outside the Capitol building.

After exiting the Capitol, Camper participated in a video interview with CBS News while still on or near Capitol grounds. On January 7, 2021, a clip of the interview was posted to YouTube under the CBS Evening News channel. In the video, Camper acknowledged that he was inside the Capitol, stating, "I was on the front line." He further stated, "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready."



*Boyd Camper's Interview*

Camper agreed to voluntarily interview with the FBI on January 21, 2021. During that interview Camper confirmed that his group went to Washington D.C. because they believed the results of the 2020 presidential election were fraudulent. Camper stated he was disappointed by the rally because he thought President Trump would present concrete evidence of the election fraud, but that did not happen.

Although Camper stated several times during the interview he observed no violence at the Capitol on January 6, he also confirmed during the interview that he witnessed people pushing the police and stated the police were using tear gas. Camper also stated he believed he was on the "front line" and entered a "combat" state of mind in which he imagined they (the rioters) would take the Capitol steps and demand transparency on the election. Camper subsequently admitted that he "picked the right hole" to get himself to a stairway area. Camper then admitted that he went inside the Capitol building.

Camper shared his belief that the protesters were "set up" because President Trump invited them to D.C. and then told them to march to the Capitol. Camper then stated he believed several busloads of Antifa members, escorted by State Police, were brought to the Capitol to wreak havoc.

Camper admitted he had a GoPro but did not want to share the contents because he did not want to implicate himself. He said he ran his mouth, was in a bad state, and did not want his words used against him. Camper reiterated he was in a military state of mind and felt he implicated himself because he sounded like he was trying to take over the place but stated he did not physically do anything wrong. Camper stated several times that despite his words, he did not believe anyone listened to him inside the Capitol, again in reference to the GoPro. Camper was

willing to share the GoPro footage with the FBI but only if he received a guarantee that the footage would not be used against him.

On March 11, 2021, Camper contacted law enforcement and spoke with an FBI agent. The agent asked if defendant Camper still had the Go-Pro, and he told her it was "inaccessible, buried out in the cold" and did not reveal its location.

*The Charges and Plea Agreement*

On March 11, 2021, Boyd Camper was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On August 5, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Boyd Camper agreed to pay $500 in restitution to the Department of the Treasury.

**III.   Statutory Penalties**

The defendant now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford

adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of incarceration.

### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant

traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Analyzing these factors points to a sentence of incarceration for 3 reasons:

First, although Camper reports that he prevented someone from using a pitchfork, he was aware that rioters were engaging in violence at the Capitol on January 6 and nonetheless went in. Camper made sure his son stayed back because of the danger, he observed police being pushed by rioters, he reported being in a military mind set, being on the front line, and he even got tear gas in his eyes.

Second, Camper showed no remorse for his conduct by giving a television interview and claiming that he was operating under the "insurrection act."

Third, and most importantly, Camper almost certainly destroyed key evidence of his crime by "burying" the footage "out in the cold".

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of incarceration in this matter.

### B. The History and Characteristics of the Defendant

As set forth in the PSR, Boyd Camper has a criminal history stretching back to when he was 30 years old being convicted of "Lewd Acts in Public" (ECF 26 at ¶ 33) up through his most recent arrest in 2015 for "Inflict[ing] Corporal Injury on Spouse" (ECF 26 at ¶ 38).  Camper reported to the PSR writer that he enlisted in the U.S. Marines in April 1987 and was honorably discharged in 1990.  He has most recently been working in real estate sales. Camper has been compliant with his conditions of pre-trial release.

While Camper's military service is laudable, it renders his conduct on January 6 all the more egregious. As a former military member, Camper was well aware that taxpayer status does not bestow upon a person the right to enter restricted government buildings. His voluntary decision to storm a guarded government building is nothing short of shocking in light of his former military service and training. In this case, Camper's former military service and criminal history demonstrates a very real need for specific deterrence in the form of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

10

from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on

11

January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Boyd Camper's post-arrest television interview clearly demonstrates the need for specific deterrence for this defendant. After exiting the Capitol, Camper stated to the media "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." This statement illuminates Camper's intent on January 6 but also reveals the potential for future violence from this defendant. Likewise, Camper's concealment of evidence from the FBI is aggravating, to say the least.

As of the date of this filing, Camper has not expressed remorse. When interviewed by the FBI, he repeatedly asserted that he had done nothing wrong. The government acknowledges that the Defendant accepted responsibility by entering into this plea agreement. On the other hand, the Defendant's failure to acknowledge the dangers and violence of January 6, 2021, and his lack of remorse underscore the need for specific deterrence in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor

defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[2] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous; and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home confinement. After a review of the applicable Section 3553(a) factors, the government believes that the defendant's conduct falls in the former category.

---

[2] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

## V. Conclusion

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a). As detailed above, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Boyd Camper to two months incarceration and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By: *(signature)*
JACOB J. STRAIN
Utah Bar No. 12680
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530