UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

United States of America                    )
                                             )
    v.                                       )          USDC No. 21-cr-0325-05 (CKK)
                                             )
Boyd A. Camper,              *defendant*.    )

DEFENDANT'S SENTENCING MEMORANDUM

Defendant, through undersigned counsel Nathan I. Silver, II, Esq., appointed by this

Court under the Criminal Justice Act, submits this memorandum to aid him on November 12,

2021, when he appears before the Court for sentencing.

1. Defendant was charged with four misdemeanor offenses resulting from his

involvement in the Capitol Hill protests of January 6, 2021.  The government and defendant

reached a plea agreement that allowed him to enter a plea of guilty to Count Four of the criminal

Information, "Parading, Demonstrating, or Picketing in a Capitol Building," in violation of 40

U.S.C. §5104(e)(2)(G).  That offense, which is considered a Petty Offense, carries up to six

months imprisonment, a fine of not more than $5,000, and an obligation to pay any applicable

interest on fines and restitution not timely made. There is also a $10 special assessment payable

to the Court.(Presentence Report ["PSR'], p. 3, ¶5.

2. As a result of the plea agreement, the Government will dismiss the remaining three

charges. They are: Entering and Remaining in a Restricted Building (Count One), in violation of

18 U.S.C. §1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building (Count Two),

in violation of 18 U.S.C. §1752(a)(2), Violent Entry and Disorderly Conduct in a Capitol

Building (Count Three), in violation of 40 U.S.C. 5104(e)(2)(D).   It will also insist on, and the

defendant has agreed to, a payment of $500.00 (five hundred dollars) in restitution towards

defraying the roughly $1.5 million cost of repairs to the U.S. Capitol. (PSR, p.. 3, ¶7)  There is

no agreement with respect to the government's allocution at sentencing.

      3.  The defendant came to Washington in early January with two other adults and his son.

Mr. Camper was skeptical of the result of the 2020 election, convinced that a victory had been

stolen from President Trump.  He brought with him his son so the two could visit the Nation's

Capital and experience it together.  He planned to attend then-President Donald Trump's speech

on the Mall.  The two attended that speech; the defendant found the president's words wanting.

and joined the large group that marched to the U.S. Capitol.  Though not satisfied with the

president's speech,  Mr. Camper still wished to register his disappointment with the results of the

election and his distrust of  the electoral process.   He was determined to protest peacefully,

without harming other persons or property.  It was not his purpose to disrupt official

proceedings--involving the certification of the vote of the Electoral College--unlike that of many

in the crowd.  He left his son with a friend and mounted an elevated plaza outside the building.

Below him, probably one or two storeys,  he saw some people several times charging toward the

police, and then pulling back without making physical contact.   From his location he was able to

enter the Capitol peacefully.  While inside, he took steps to keep others from becoming violent,

and strove to assure the police that he had no truck with those who disparage them or their

service; on the contrary, he told more than one officer that he "backed the Blue."  To quell

possible violence, he sawa man who had what appeared to be a pitchfork, grabbed it from the

man's hand, and threw it in a corner behind some shipping boxes.   Mr. Camper, a former

Marine, told him, "This is not a violent protest."[1]  The defendant's time appears to have been

spent in mostly the large public areas such as the Rotunda, but not with the crowds that roamed

through the corridors seeking out confrontations with members of Congress, some entering their

private offices (as was notoriously done in the case of Speaker Pelosi) or even the legislative

chambers of the Senate and House of Representatives.  While in the building, he became

confused about his location and how he might leave the building.  Then he asked a police officer

for help and was able to exit.  He left of his own accord.

    4.  On leaving the Capitol, Mr. Camper encountered a CBS television reporter and film

crew.  The reporter spoke with him and the interview, which included identifying him by name,

appeared on the network's evening news.  Mr. Camper's words were strident, even vitriolic.  He

spoke of being "on the front line," had entered "a combat mode," and referred specifically to the

Insurrection Act.  One must keep in mind that the defendant said these things in an excited state

on *leaving* the building, not while entering it; thus, they don't necessarily reflect his thoughts,

feelings or *intentions* when he entered. He found himself part of a large, boisterous, rowdy

crowd, and though possibly inflamed or infuriated by what he saw as a travesty of the electoral

process and there to protest, he never engaged in violent conduct before, during or after he was

in the Capitol.

    5.  The defendant prepared a statement which he included in his objections and

corrections to the Draft PSR.  He supplied this to U.S. Probation Officer Hana Field. Counsel

---

[1] Defendant specifically disputes the government's assertion  that "he was aware that rioters were engaging in violence at the Capitol on January 6…" (Government's Sentencing Memorandum ["GSM"], page 9, part IV(A), "Nature and Circumstances of the Offense."  As noted *supra*, he saw people charging, though not colliding with, the police some distance away but not in the area from which he entered.

believed, and the defendant ultimately accepted,  that the statement should appear in this

Memorandum.  Presented *verbatim*, he wrote:,

"DEFENDANT'S STATEMENT:

*I respectfully and Sincerely regret entering the Capital and apologize for my contribution*

*to the chaos that day.  I had no intention of harm, violation to any person or property.  I knew*

*nothing of this march until the rally as mentioned by our then President.  I got caught up in the*

*synergy and moment of the crowd and made a bad decision to enter.  My conduct was not violent,*

*did not damage anything, I  respected our police officers.  I thought at the moment I was simply*

*protesting and then exited the Capital.  I realize my bad choice made and own that I should not*

*have entered without proper screening and authority.  Looking at my life's history, it is*

*overwhelming to view.  Not to justify my actions, but coming from "the other side of the tracks"*

*self respect was all I had.   I am grateful for my life today, my faith, and the recovery community*

*has strengthened me through life's travels. Helping others through the same struggles  I have*

*walked through is my greatest joy in life(besides my kids).  I have been forgiven of my past deeds*

*and strive today to live a godly life, abiding by the law and highly respecting and supporting our*

*officers.  I have lived to become older and much more responsible as the Lord carried me when I*

*was young and foolish. I look forward to starting over with my daughter as this experience has*

*been too difficult to remain in Montana.  My time in the Marine Corps solidified my love of our*

*country and the freedom we have.  I have no desire to pursue any politics, movements or*

*agendas. I  love our country and the Freedom we stand for.*

6. The defendant maintains, and hopes the Court will take him at his word, that he did not

realize at the time he entered the Capitol that it was illegal or improper for him to do so.  He has

insisted that signs that might have been telling--such as people fighting with the police, the tear

gassing of protestors, or people breaking and entering through broken windows or doors--did not

occur near the entrance that he used, though he did see at some distance (below his location)

confrontations between police and protesters, and clouds of what he surmised was tear gas as his

eyes began to burn.[2]  On the contrary, he says he entered with the apparent permission, at even

the invitation, of police officers.  The government took seriously the defendant's account, was

able to examine several videos taken with his Go-Pro camera, which he provided through

counsel[3], and did not require as a condition of the plea agreement that Mr. Camper knew or

should have known he had no permission to enter the Capitol.[4]  Yet without qualification he takes

responsibility for his conduct.

7. A danger these laws are designed to prevent is the danger of the *crowd*.  The criminal

responsibility Mr. Camper bears was demonstrating as part of a crowd that, from its very size,

agitation and in some instances fury, emboldened some participants to become violent; the

anonymity of a crowd can create misplaced feelings of sanctuary.  Crowds are dynamic, not

static, and can evolve into destructive forces the larger they grow.[5]

---

[2] It would be analogous to a scuffle taking  place outside a stadium between rowdy fans and security guards, yet separate and apart from others who enter the venue without incident.

[3] Though the FBI interviewed Mr. Camper twice, once in January and again in March, the agent did not ask the defendant to produce the Go-Pro, which he said he had buried, not that he destroyed it. In fact, he offered to produce it so long as he knew its contents would not be used against him.  He did not receive such an assurance, and therefore he did not produce it or disclose its location.

[4] In discussions with the government, the defendant, through counsel, acknowledged that the government is free to argue at sentencing that Mr. Camper either knew it was illegal to enter or that he was "willfully blind" to signs that he would be breaking the law if he entered.

[5] For a discussion of how riots develop, see Edward C. Banfield, *The Unholy City Revisited*, Chap. 9, "Riots Mainly for Fun and Profit," Boston: Little, Brown & Co., 1974. Of the four categories of riots Banfield identifies, the January 6 protests most resemble "an outburst of righteous indignation," in which rioters "are moved by indignation at what they regard, rightly or wrongly, as injustice or violation of the mores that is likely to go unpunished." (at 215-216)  In the New York draft riot of 1863, Banfield notes, "the interaction among types of rioters tends to

8.   The defendant has paid a high price for his behavior.  Apart from being prosecuted in a federal criminal case, one that has attracted enormous attention for obvious reasons, and living with the uncertainty defendants experience, he became a pariah in his home state of Montana. Friends of years have renounced friendship with him; business associates, companies and merchants have severed ties..  As a result, he has moved to another state to get  a fresh start.   His son, whom Mr. Camper previously schooled at home, will be enrolled in a public school by the time of the sentencing.  The defendant  hopes the two will have a better life in their new home and community.

9.   Much of the defendant's history, recorded in the PSR, is a sad one.  There it is laid out in detail. The near-drowning and calamitous injury to his infant son Eric in 1989, leaving him quadriplegic until his death in 2006, is the most sorrowful.  (PSR, ¶50, page 13) Yet the defendant has tried, valiantly and at times successfully, to overcome obstacles his background created and aspects of his character that made much of his life a hard one.  The portrait the PSR draws is of one who from time to time has reacted angrily, though not physically, in disputes he's had with others.[6]  Requiring the defendant to seek and complete an anger management program may be indicated..  A person such as Mr. Camper, who on his own has been able to eliminate his habit of alcohol abuse, and remain sober for more than a decade, would likely have the resources to .

---

reinforce the motives and heighten the activities of each type."  Yet three-fourths of those who rioted, The New York Times estimated in its reporting, were not even subject to the draft. (Id.,at 218)

[6] The government's statement in its Sentencing Memorandum that Mr. Camper "has a criminal history stretching back to when he was 30 years old" implies that the defendant's record is a substantial one. (Govt. Sentencing Memo, In fact, it consists of one misdemeanor conviction from 1996; a second charge dismissed; a third "released" for insufficient evidence, and two more (battery in one case, motor vehicle offenses in the other) with unknown resolutions. See PSR, Part B. "The Defendant's Criminal History," ¶¶32 through 42, pages 7-11.

10.  The Court must consider, under 18 U.S.C. §3553(a) the following factors:

(a) Factors To Be Considered in Imposing a Sentence. - The court shall impose a sentence

sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)

of this subsection. The court, in determining the particular sentence to be imposed, shall consider

- (1) the nature and circumstances of the offense and the history and characteristics of the

defendant; (2) the need for the sentence imposed - (A) to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; (B) to afford

adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the

defendant; and (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner….

11.  Defendant has seen that the government recommends a sentence of two months

incarceration, while the probation office recommends half that.  Defendant submits that an

appropriate sentence would be probation[7] with several conditions.  Defendant has previously

helped people in need in his community.  He did this not because he was required to but from an

urge to help others.  (In fact, Mr. Camper founded the Granite Co. Food Pantry in Philipsburg

when he saw the need for one arise.) So the performance of community service would be a

---

[7] Defendant takes exception to Judge Thomas F. Hogan's statement, quoted with approval by the government, in its Sentencing Memorandum: "As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected." (from *United States v. Joshua Bustle and Jessica Bustle,* 21-cr-238 (TFH), Tr. 08/24/21 at page 3.  Judge Hogan was probably using the word "presumption" to stress, in his view, the seriousness of the conduct.  Actual presumptions are absent from sentencing. (Mandatory-minimum terms of imprisonment are not presumptive but conclusive, though Congress has created exceptions to them [i.e., the safety valve--reserved for drug cases--and credit for cooperation].)  Nor do the federal sentencing guidelines create actual presumptions. Rather, they are advisory in nature, meant to help judges by establishing ranges for what is considered a reasonable sentence in the circumstances. And not even a sentence *within* the guidelines is presumptively reasonable. *See United States v. Fernandez,* 443 F.3d 19 (2d Cir. 2006) (The sentencing guidelines don't apply to the instant offense, which is classified as"petty.") Finally, the phrase "in these cases" suggests the many January 6 defendants had uniform motivations or purposes, when those might have varied widely.

corrective use of the defendant's time and abilities and be a suitable substitute for incarceration.

Further, it would reflect a proper application of the statutory sentencing factors. Such a

sentence, incorporating home confinement if indicated and a requirement of community service,

would serve the deterrent purposes--both for the defendant himself and of others--of the statute.

Defendant requests lastly that the Court not impose a fine as he has not the means to pay. .

(DPSR, page 15, ¶72)

12. A sentence of probation, with stringent conditions, would also allow the defendant,

who has sole physical custody of his son, to continue providing the proper care.. Given that the

defendant and his son are in a new community, with the disruptions that naturally follow a move,

a sentence of incarceration would be a new complication.

13. In the event that the Court sees incarceration as a necessary and suitable punishment

in these circumstances, the defendant requests (1) that he be permitted to serve his sentence by

weekends in a local jail facility that contracts with the U.S. Bureau of Prisons or the U.S.

Marshal's Service, or (2) that, in the event he be permitted to self-surrender the Court imposes

straight, i.e., continuous, jail time.

14. Defendant urges the Court to view his actions in the light presented in this

memorandum: not as one who intended to commit a crime but who did an act that constituted a

crime, one he is sorry he committed.

This pleading is,

Respectfully submitted,

/s/

NATHAN I. SILVER, II
Unified Bar #944314
6300 Orchid Drive

Bethesda, MD 20817
(301) 229-0189 (direct)
(301) 229-3625 (fax)
email: nisquire@aol.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing pleading has been served via ECF on Jacob Strain, Esq., assistant U.S. Attorney for the District of Utah, this 3rd day of November, 2021.

/s/

_____

*Nathan I. Silver, II*